IN THE UNITED STATES DISTRICT COURT FOR THE
NOTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

PHILLIP TREY KNIGHT,      )
                          )
    Claimant,             )
                          )
                          )      CIVIL ACTION NO.
                          )      4:17-CV-02033-KOB
                          )
ANDREW SAUL,              )
ACTING COMMISSIONER OF    )
SOCIAL SECURITY,          )
                          )
    Respondent.           )
                          )

## MEMORANDUM OPINION

## I. INTRODUCTION

On September 3, 2014 the claimant, Phillip Trey Knight, filed a Title II application for a

period of disability and disability insurance benefits, alleging disability onset of March 3, 2014.

(R. 27).  The claimant alleges disability resulting from peripheral edema secondary to peripheral

vascular insufficiency, sleep apnea, hypertension, congestive heart failure, lumbar degenerative

disc disease with radiculopathy, left knee degenerative joint disease, diabetes mellitus, and

obesity. (R. 29). The Commissioner denied the claim on October 31, 2014. (R. 84). The claimant

filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a

hearing on July 25, 2016. (R. 45).

In a decision dated October 14, 2016, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and was, therefore, ineligible for social security benefits.[1] (R.

27-40). On October 5, 2017, the Appeals Council denied the claimant's request for review. (R. 1-

---

[1] The claimant filed a subsequent application for disability and the Social Security Administration, on
February 18, 2018, found him disabled with an onset date of October 12, 2016, two days prior to the ALJ's decision
in this case. (Doc. 7-1).

3). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUE PRESENTED

Whether the ALJ failed to accord proper weight to the claimant's treating physician Dr. Ayres.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th reCir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The ALJ must state with particularity the weight he gave different medical opinions and his reasons, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also Perez v. Comm'r of Soc. Sec.*, 625 F. App'x 408 (11th Cir. 2015); *Martinez v. Acting Comm'r of Soc. Sec.*, 660 F. App'x 787 (11th Cir. 2016). The ALJ must give the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004). Good cause "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent

with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11ᵗʰ Cir.

2003) (*citing Lewis v. Callahan*, 125 F.3d 1436, 1440 (11ᵗʰ Cir. 1997)). The Commissioner may

reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764

F.2d 834, 835 (11th Cir. 1985). If the ALJ articulates specific reasons for failing to give the

opinion of a treating physician controlling weight and substantial evidence supports those

reasons, the ALJ does not commit reversible error. *Moore v.Barnhart*, 405 F.3d 1208, 1212 (11th

Cir. 2005).[2]

## V. FACTS

The claimant was 49 years old at the time of the ALJ's final decision. (R. 53). The

claimant has a high school education, with one year of college. (R. 53). The claimant served in

the Air Force for 20 years, and worked at Honda as a quality inspector for 15 years until his

alleged onset of disability on March 3, 2014. (R. 48, 49). The claimant has not engaged in

substantial gainful activity since his onset date. (R. 29). The claimant alleges disability resulting

from peripheral edema secondary to peripheral vascular insufficiency, sleep apnea, hypertension,

congestive heart failure, lumbar degenerative disc disease with radiculopathy, left knee

degenerative joint disease, diabetes mellitus, and obesity. (R. 29).

---

[2] On January 18, 2017, the Commissioner published final rules titled "Revisions to Rules Regarding the
Evaluation of Medical Evidence" that no longer requires the ALJ to specify the weight he gives to any medical
opinion, including one from a treating physician. 82 Fed. Reg. 5844; *see also* 82 Fed. Reg. 15,132 (Mar. 27, 2017)
(amending and correcting the final rules published at 82 Fed. Reg. 5844). As part of the final rules, the
Commissioner rescinded SSR 96-5p regarding the weight to give treating physicians. *See* 82 Fed. Reg. at 5845; 82
Fed. Reg. 15,263 (Mar. 27, 2017); *see also* 82 Fed. Reg. 16,869 (Apr. 6, 2017) (correcting the effective date of the
rescission). However, the final rules and rescission of SSR 96-5p only apply to claims filed on or after March 27,
2017. Because the claimant applied for disability in 2014 and the ALJ's decision was in 2016, SSR 96-5p and the
regulations at 20 C.F.R. § 404.1527 apply to this case.

*Physical Impairments*

In October 2008, the claimant presented to Vein and Vascular of Hoover on referral from Dr. Muratta for swelling in his feet.[3] (R. 430). Surgeon James Isobe noted a pre-op diagnosis of venous insufficiency of the left leg because of great saphenous vein incompetence, causing leg pain, swelling, and ropy varicose veins.[4] The claimant underwent an endovenous laser ablation of the great saphenous vein. (R. 425-31).

On January 9, 2012, the claimant presented to Southern Pain Management for a follow-up on his bilateral foot neuralgia and degenerative arthritis in his left knee. The claimant rated his pain as a three out of ten, and described the pain as a constant, dull ache. The claimant also rated the effectiveness of his medication at 90%. The claimant stated that his pain interfered with his sleep and limited his physical activities, and that any increase in activity would aggravate his symptoms. Finally, the claimant stated that his last procedure was a knee injection two years prior and that he did not feel like he needed another knee injection yet. Nurse Practitioner (NP) Karina Crosen noted that the claimant moved from the chair to the exam table with ease; that he had a normal gait; and that the claimant had no lower extremity swelling that day. NP Crosen also noted that the claimant had crepitus with motion in his knees, but his knees showed no effusion or gross instability. NP Crosen consulted with Dr. Muratta and continued the claimant's pain medication prescriptions: 8 mg of Suboxone daily and 300 mg of Neurontin every eight hours. (R. 349).

On February 3, 2012, NP Crosen completed a Medical Source Statement for Honda stating that, because of the claimant's "[p]eripheral neuropathy in both of his legs with ganglions

---

[3] No medical evidence in the record from Dr. Muratta predates the claimant's referral to Vein and Vascular of Hoover.

[4] The medical record is unclear whether the claimant was first diagnosed with left leg venous insufficiency on this date, or at an earlier time.

to both feet" and "varicose/spider veins in both legs," he was incapacitated from work four times a month, for a duration of two days. (R. 432).

From July 11, 2012, to January 7, 2014, the claimant sought treatment at Southeastern Pain Management eleven times for bilateral foot neuralgias, degenerative arthritis of the left knee, and bilateral knee and ankle pain. Nurse Practitioner Shannon Doyal saw the claimant at each visit and consulted with Dr. Muratta concerning the claimant's treatment plan. NP Doyal renewed the claimant's pain medication prescriptions, Suboxone and Neurontin, at each visit and she increased the claimant's dosage on several occasions. At each visit, the claimant consistently described his pain as constant with a dull ache and sharp at times. Additionally, the claimant stated at each visit that his pain interfered with his sleep and limited his activities. The claimant rated his pain from a three to a six out of ten, though more frequently he rated it as a five or six. The claimant reported that the effectiveness of his medications ranged from 50% to 90%, though he reported 75% most frequently throughout this time period. Additionally, NP Doyal consistently noted that the claimant reported that "rest along with the medications will help relieve his symptoms." (R. 338-48).

The claimant began reporting to NP Doyal that he had numbness in his feet on July 17, 2012. (R. 348). On September 11, 2012, NP Doyal increased the claimant's Neurontin prescription. NP Doyal noted that, in addition to the claimant's continued knee crepitus, he began having a mild build-up of fluid in his knees. On October 25, 2012 the claimant received injections in both knees for bilateral knee pain and osteoarthritis. (R. 346).

The claimant's Suboxone dosage increased during another follow-up visit at Southeastern Pain Management on November 9, 2012. (R. 345). The claimant reported that he experienced numbness and tingling in his feet and ankles. NP Doyal noted the claimant had swelling in his

lower extremities. And on January 10, 2013, at the claimant's next follow-up, in addition to swelling, NP Doyal noted the claimant had lower extremity varicose veins, spider veins, and hair loss. (R. 344).

On July 11, 2013, in addition to his usual pain, the claimant described his pain as throbbing and a five out of ten; however, he began specifying that his pain was worse on most days because of work. (R. 341). NP Doyal increased the claimant's Suboxone prescription to "8 and 2 mg one every eight hours for chronic pain." At another follow-up appointment several months later on November 5, 2013, among his usual pain and symptoms, the claimant began reporting that he had a burning sensation in his feet, and that his pain increased his irritability, and decreased his concentration and appetite. (R. 340). On December 6, 2013, NP Doyal noted filling out the claimant's medical leave paperwork. NP Doyal also noted rescheduling an appointment for the claimant to receive another round of knee injections. (R. 339).

On March 1, 2014, the claimant went to the emergency department of Gadsden Regional Medical Center in a wheelchair, with the chief complaint of edema. Dr. Diop examined the claimant and found that he had normal blood pressure, normal gait, but had swelling and erythema in his bilateral lower extremities. The claimant stated the lower extremity swelling began to get worse within the past few weeks. Dr. Diop diagnosed the claimant with cellulitis and discharged him home with instructions to follow-up with his primary care physician, Dr. Ayres. (R. 271- 72, 307-14).

The claimant followed up with his physician at Southside Medical Clinic on March 3, 2014. Dr. Ayres noted that the claimant **w**as in the Gadsden ER for "what was called cellulitis." Dr. Ayres also noted that the claimant had lower extremity swelling, hyperglycemia, and

"markedly elevated" blood pressure. Dr. Ayres prescribed Tribenzor for the claimant's high blood pressure. (R. 377).

The claimant visited Southeastern Pain Management on March 4, 2014, for a follow-up on his bilateral leg and foot neuralgia, and bilateral knee pain. The claimant stated his main pain was his back, which began about six months before and had worsened. NP Doyal noted that the claimant had intermittent bilateral leg pain. The claimant stated that he was able to work, but his particular job was "very difficult on his pain." The claimant stated his plan of care was 70% effective in managing his pain and helping with his activities of daily living. NP Doyal noted that the claimant had little tenderness to his lumbar spine, improvement of low back pain with extension of the lumbar spine, and no change in pain with flexion of the lumbar spine. NP Doyal also noted decreased sensation to the claimant's left calf. (R. 337).

The next day, the claimant visited Dr. Ayres for a follow-up. Dr. Ayres noted that the claimant's blood pressure had improved slightly; however, the claimant's lower extremity swelling persisted, and he had shortness of breath. Dr. Ayres referred the claimant to a cardiologist. (R. 375).

On March 14, 2014, the claimant presented to Southern Cardiovascular Associates on referral from Dr. Ayres. Dr. Darryl Morin noted the reason for referral as further evaluation of the claimant's "uncontrolled hypertension, significant peripheral bilateral lower extremity edema with weight gain of 20-25 pounds over the past month with the patient having significant shortness of breath at rest as well as dyspnea on exertion." The Dr. Morin noted that the claimant was on the following medications: Gabapentin for nerve pain, Lexapro for depression and anxiety, and Tribenzor. Dr. Morin did not make any changes to the claimant's medications at that

time. Dr. Morin recommended a complete 2D resting transthoracic echocardiogram, a venous doppler evaluation, and a nuclear perfusion stress study. (R. 244- 47).

Dr. Ayres completed a Medical Source Statement on March 18, 2014, for Honda on behalf of the claimant, noting that the claimant's medical condition would cause an unknown duration of continued future absence from work. (R. 446).

On March 25, 2014, the claimant's doppler exam came back normal and his transthoracic echocardiogram was abnormal showing a mildly dilated left ventricle; mild concentric left ventricular hypertrophy; left ventricular systolic function (mildly rooted); ejection fraction about 45%; and mild aortic dilation. (R. 265-66). The claimant's nuclear cardiology study showed he had left ventricular dilation; mild reduction radioisotope uptake in the inferior wall; generalized left ventricular hypokinesis; and a severely hypokinetic septum. (R. 248).

The claimant underwent a heart catheterization at Gadsden Regional Medical Center on March 28, 2014, which came back abnormal and indicated an intermediate risk of ischemia. Dr. Morin recommended medical therapy and/or counseling, a follow-up with the claimant's primary care physician, and risk factor modification. (R. 255-62).

On April 4, 2014, the claimant visited Gadsden Regional Medical Center again to get an MRI because of his lower back pain. The MRI results came back normal. (R. 295-96).

At a follow-up visit on April 11, 2014, Dr. Ayres noted the claimant had excessive sleep difficulties, panic attacks, and lower extremity swelling. Dr. Ayres stated that the claimant was still unable to work. (R. 369).

During another follow-up with the claimant on April 25, 2014, Dr. Ayres noted that he believed the claimant's uncontrolled sleep apnea worsened his hypertension and swelling. Dr.

Ayres stated that it was unsafe for the claimant to return to work until after his appointments with a sleep apnea doctor. (R. 368).

The claimant went to Southeastern Pain Management for a follow-up on May 1, 2014, and reported that his overall back and joint pain had improved since being out of work in March earlier that year. NP Doyal noted that the claimant continued to have leg pain and that he was keeping his leg elevated and rested. NP Doyal consulted with Dr. Muratta and restarted the claimant on 375 mg of Naprosyn twice daily for his inflammatory pain; however, NP Doyal instructed the claimant to stop taking it if he noticed an increase in swelling. (R 336).

On May 16, 2014, the claimant presented to Eastern Pulmonary Sleep and Allergy, on referral from Dr. Ayres, seeking treatment and evaluation for his obstructive sleep apnea. (R. 350-60). Dr. Dey noted that the claimant's sleep apnea was poorly controlled. Dr. Dey also noted that the claimant's BiPAP download showed poor usage, and when he did wear his BiPAP, the claimant was still having moderately severe apnea. Dr. Dey further noted that the claimant had severe daytime sleepiness. (R. 353). The past medical history included edema, depression, obstructive sleep apnea, generalized anxiety disorder, and neuropathy. Dr. Dey opined that the claimant needed BiPAP adjustments and a follow-up visit pending his sleep-test results. (R. 355).

The claimant underwent a sleep study at St. Vincent's East Sleep Center on June 13, 2014. (R. 356-60). The assessment concluded the claimant had severe sleep apnea with hypersomnia. (R. 359).

On July 3, 2014, the claimant visited Southern Cardiovascular Associates for a follow-up on his bilateral lower extremity swelling and shortness of breath. (R. 241-43). Dr. Morin recommended admission to the hospital for further treatment "as the patient is having a difficult time breathing while sitting here in the office" and the claimant was "noticeably uncomfortable."

Gadsden Regional Medical Center admitted the claimant that day, noting edema as the reason for his admission. (R. 252-54, 275-94). Nurse Janie Goodwin noted, "it is obvious [the claimant] is having trouble breathing," and that the claimant had significant swelling in his bilateral extremities, as well as chronic venous insufficiency and color changes. The claimant had a chest x-ray, which showed no acute disease. The claimant remained hospitalized until July 6 for treatment and evaluation, during which time he had IV diuretics, daily weigh-ins, and repeat transthoracic echocardiograms that all came back abnormal. Upon discharge, the claimant's care plan instructions included leg elevation, oxygen administration, and rest promotion.

While at Gadsden Regional Medical Center for edema, the claimant saw Dr. Masood for obstructive sleep apnea. Dr. Masood noted that the claimant had a history of severe obstructive sleep apnea, but had been noncompliant with his BiPAP therapy. Dr. Masood assessed that the claimant had severe obstructive sleep apnea, chronic hypercapnic respiratory failure secondary to obesity, hypoventilation syndrome, obesity, and congestive heart failure. Dr. Masood also noted that the claimant had a high hemoglobin level, because of hypoxia. Dr. Masood discussed BiPAP compliance with the claimant, and made suggestions and adjustments to improve his compliance. Dr. Masood also prescribed the claimant Ambien to help him sleep at night. (R. 275-77).

On July 10, 2014, the claimant went to Southeastern Pain Management for a follow-up on his bilateral leg and foot neuralgia, bilateral knee pain, and low back pain. He reported that he was placed in the hospital for three days and that the etiology of his lower extremity of edema was still unknown. NP Doyal discontinued the claimant's Neurotin and Naprosyn because they may have been causing more swelling. (R. 335).

On July 28, 2014, Dr. Ayres noted during a follow-up appointment that the claimant could not return safely to his current employment, and he recommended that the claimant seek

long term disability. (R. 383). During another follow-up appointment on August 25, 2014, Dr. Ayres noted the claimant was disabled long term and that "[the claimant's] symptoms have not improved with any treatments." (R. 365).

During another follow-up appointment on September 9, 2014, NP Doyal noted a nodule on the claimant's great left toe. The claimant reported that the pain worsened with standing and he rated his pain as a six out of ten. (R. 334).

From October 2014 to April 2015, the claimant visited Southeastern Pain Management five times for a follow-up on his bilateral leg and foot neuralgia, bilateral knee pain, and low back pain. The claimant rated his pain as a four or five out of ten at each visit, and consistently described a combination of dull, sharp, throbbing, and stabbing pain. He also reported numbness and tingling in his feet, and worsened pain when standing. The claimant continued to have lower extremity swelling, varicose veins, and hair loss to that area at each visit. (R. 395-416).

The claimant's mother, Elaine Knight, completed a Third Party Function Report on October 2, 2014, for the Social Security Administration on behalf of the claimant. (R. 183-90). Ms. Knight reported she had known the claimant his entire life and that she spent time with the claimant four times a month. In the daily activities section Ms. Knight noted that the claimant "mostly stays at home" and "if he doesn't prop his legs up they start to swell." Under the "House and Yard Work" section, Ms. Knight reported the claimant could mow his lawn on a riding lawn mower and that "sometimes somebody else does it for him." In response to whether the claimant needed help or encouragement performing his house and yard work, Ms. Knight reported that the claimant needed help sometimes and noted that he had problems with depression. Ms. Knight reported that the claimant's problems with standing were what kept him from doing house or yard work. She also reported that the claimant's sleep apnea and leg pain affected his sleep.

In the "Getting Around" section Ms. Knight stated the claimant went to the doctor and took his daughter to her mother's house. Ms. Knight reported the claimant did not have hobbies and that he reads and watches television. Ms. Knight noted the claimant could not "stand on his feet long" and that his legs "are purple, blue, and red below the knees." Ms. Knight reported the claimant's leg neuropathy and "bad knee" affected the following activities: lifting, squatting, standing, walking, kneeling, stair climbing, completing tasks, concentration, understanding, and following instructions. She also reported that the claimant had pain upon standing or walking for a "certain period of time" and that his legs begin to swell and turn dark. Finally, Ms. Knight noted that the claimant used to be very active.

On October 30, 2014, Scott Touger, M.D., a non-examining state agency physician, completed a Disability Determination Explanation for the claimant's disability claim. Dr. Touger reviewed the claimant's medical history and determined that the claimant had medically determinable impairments that could reasonably be expected to produce the claimant's pain or other symptoms; however, Dr. Touger opined that the claimant's subjective statements about his symptoms were not substantiated by medical evidence. Dr. Touger also determined that the claimant could sit, stand, and walk for about six hours of an eight hour day; occasionally climb stairs, ramps, ladders, scaffolds, ropes; occasionally lift or carry twenty pounds; occasionally kneel and crouch; frequently crawl and stoop; and frequently lift or carry ten pounds. In making his determinations, Dr. Touger noted that the claimant's non-compliance with his medicine and CPAP worsened his condition. Dr. Touger further stated that the claimant's recent physical exams, after his hospital stay in July 2014, showed his swelling was resolved. (R. 69-81).

During a follow-up appointment on January 28, 2015, Dr. Ayres noted that the claimant continued to have problems with peripheral neuropathy that resulted in lower extremity swelling

if, "he is on his leg for any period of time." Dr. Ayres also noted the claimant's statement that he basically stayed inactive so that his legs did not swell. Dr. Ayres further noted that the claimant's swelling continued to prevent him from wearing the appropriate shoe wear for work and that the claimant "basically wears slippers all the time."  In Dr. Ayres' assessment he listed hypertension, peripheral neuropathy with resultant peripheral edema, sleep apnea, and elevated hemoglobin. Dr. Ayres also stated, "I do not anticipate [the claimant] being able to work in the year 2015." (R. 420).

Dr. Morin saw the claimant for a follow-up concerning his chronic systolic heart failure, obstructive sleep apnea, and hypertension on February 3, 2015. Dr. Morin noted the claimant's statement that his lower extremity swelling was under control with the use of oral diuretics as an outpatient. Dr. Morin noted that the claimant had swelling at the appointment, but he had no focal deficits with normal gait, and normal strength and motion in all four extremities. Dr. Morin prescribed Furosemide, a diuretic to help treat swelling. At that time, the claimant was still taking medication for his blood pressure, nerve pain, and depression and anxiety. (R. 392-94).

On February 17, 2015, Dr. Ayres wrote a letter in which he stated that he had been seeing the claimant for "quite some time" regarding his multiple medical conditions leading to his disability.[5] Dr. Ayres opined that the claimant's swelling was likely "related to the fact that he is on 10 mg of amlodipine as well as probable pulmonary hypertension secondary to uncontrolled sleep apnea as he is unable to tolerate his BiPAP." Dr. Ayres also wrote that the claimant was "basically" able to carry out his activities of daily living, but "that is about all he is able to do." Dr. Ayres noted that the claimant stated that "if he moves around any significant amount his legs begin to swell and cause him a great deal of pain." Finally, Dr. Ayres wrote that the functional

<hr />

[5] The record is not clear to whom, or for what purpose the letter was written. However, Dr. Ayres noted that his letter was a response to a list of questions given to him.

deficits were "essentially self-reports" from the claimant; however, upon Dr. Ayres' examination, the claimant had a significant amount of peripheral edema with chronic changes of venous stasis, and fairly poorly controlled hypertension. (R. 422).

On June 3, 2015, the claimant visited Dr. Ayres and discussed pain medications. Dr. Ayres noted that "[t]he patient has been on Suboxone and wants to come off and cannot afford it." Dr. Ayres advised the claimant that he did not do chronic pain management and referred the claimant to a pain management clinic. (R. 418).

The claimant presented to Coosa Pain & Wellness on August 5, 2015, on referral from Dr. Ayres, complaining of back and knee pain. The claimant rated his pain as a six out of ten and described his pain as constant aching, hot-burning, "pins and needles," and tingling. Dr. Lackey noted that the claimant's pain radiated to his bilateral lower extremities. Dr. Lackey also noted that the claimant's past treatment included anti-inflammatory medications, muscle relaxants, narcotics, exercises, heat, ice, physical therapy, and surgery. Dr. Lackey reported that the claimant *denied* shortness of breath, limb swelling, limb pain on walking, pedal edema, ankle and foot swelling, and depression. However, the claimant reported numbness and anxiety. Upon examination, Dr. Lackey observed that the claimant *did* have swelling. Dr. Lackey prescribed 10 mg of Norco every eight hours for pain. (R. 454-58).

On October 23, 2015, Dr. Ayres completed a "Certification of Health Care Provider for Serious Health Condition" form for Honda on behalf of the claimant. Dr. Ayres opined that he did not anticipate a return to work by the claimant. Dr. Ayres stated that he would need to see the claimant two or three times a year for follow-up treatments. Dr. Ayres also reported that the claimant sought medical leave because of his chronic lower extremity swelling, which prevented him from standing for prolonged periods of time and wearing the proper shoe wear. Further, Dr.

Ayres stated that the claimant's condition could not improve with medication. The legible objective/clinical findings that Dr. Ayres noted included the claimant's accelerated blood pressure, swelling in the lower extremities, lowered pulses in his feet, and leg pain. Additionally, Dr. Ayres listed that the claimant's functional limitations included the inability to walk greater than 50 feet, pain, shortness of breath, and minimal standing. (R. 440-47).

On November 2, 2015, the claimant had a test conducted at Valley Center of Nerve Studies and Rehab on referral from Dr. Lackey. (R. 453). The NCV and EMG findings were abnormal, showing peripheral polyneuropathy and multifocal sensory findings on the lower extremities. That same day, the claimant visited Coosa Pain & Wellness for a follow-up complaining of feet and left knee pain. (R. 451-52). Dr. Lackey noted that the claimant's pain worsened when walking and standing, and that the claimant's current pain level was a seven out of ten. Dr. Lackey doubled the claimant's Norco prescription.

From December 28, 2015, to April 25, 2016, the claimant followed up with Coosa Pain & Wellness for his knee and foot pain. (R. 449-50, 468-73). The claimant reported aching, tingling, and hot-burning pain. The claimant also reported his activity and pain had improved after starting medications, and he described his mood and sleep as "good." Dr. Lackey continued the claimant's pain medication throughout treatment. On April 25, 2016, Dr. Lackey noted that the claimant's gait appeared to be normal and that he was able to do a heel and toe walk. (R. 468-70).

On March 8, 2016, Dr. Ayres filled out a Disability Medical Request Form on behalf of the claimant. (R. 463-66). Dr. Ayres opined that the claimant's primary diagnosis was congestive heart failure, diabetic peripheral polyneuropathy, hypertension, and sleep apnea. Additionally, Dr. Ayres placed specific restrictions on the claimant including no climbing, standing for

prolonged periods of time, exertion, or lifting, especially above his head. (R. 463- 66). In the functional ability assessment section, Dr. Ayres indicated the claimant could sit, reach at desk level, firmly grasp, see, and hear for 2.5 to 5.5 hours a day. Dr. Ayres also reported the claimant could stand, walk, reach overhead or below waist, lift or carry 10 to 100+ pounds, balance, stoop, kneel, crouch, crawl, and use his lower extremities for foot controls for 0-2.5 hours a day. Dr. Ayres marked no limitation on claimant's ability for fine manipulation and simple grasp.

*The ALJ Hearing*

The claimant testified that he was previously in the military for 20 years and retired in 2006. (R. 48-49). The claimant began working for Honda in 2001, where he worked for 15 years until 2014. (R. 49). The claimant also testified that he had intermediate leave at Honda "for years" because his feet would swell so badly. The claimant stated that his leave commenced four times a month, and that he would usually take Wednesdays to ice his feet and keep them elevated to relieve the swelling.

The claimant testified that the main reason he eventually quit his job was because of his feet. (R. 50). He had a big knot on his toe and his feet would "swell up huge" and turn red. The claimant testified that he worked on his feet like that for years while taking strong pain medication. However, eventually the pain medication did not help. The claimant had to be pushed out of work in a wheelchair on his last day. (R. 50). The claimant testified that the swelling in his feet was caused by peripheral edema, per his primary physician Dr. Ayres.

The claimant testified that he went to Vein and Vascular of Hoover in 2008 for help with his feet about two years after his symptoms started. (R. 51). His vein removal surgery made his feet feel better for a few months; however, after about six months, "it was back to normal." The claimant testified that standing up or driving caused his feet to swell. He kept his feet up "all day,

just about every day" to help the swelling. The claimant testified that, when he was working, he would ice his feet every day when he got home, which also helped the swelling. (R. 52).

The claimant testified that his back had not been bothering him since he had been out of work because he could sit more. (R. 52). He had surgery on his left knee and has "a lot of knee pain." (R. 52). He tries to stand "as little as possible." (R. 53). When asked if he was able to do housework, the claimant stated he could do about fifteen minutes worth before needing to lay back down. The claimant also testified that he hardly sat, and that he was "always laying," or, if he was sitting, he would sit in his recliner with his feet propped-up. (R. 53-54). The claimant stated he could lift 50 pounds for a short period of time. (R. 54).

The claimant also testified that he was divorced and living with his 16-year-old daughter, who had her own car. He went to his daughter's track meets and an AB honor roll ceremony. He also testified that he tried to attend church but had only been once in the past couple of months.

The claimant stated that he was taking all of his medicine, but was no longer taking any pain medication because he was "broke." (R. 54). He was previously in pain management, but currently was only taking over the counter medications, "eight to ten ibuprofens a day usually." (R. 55). The claimant also testified that he had bad sleep apnea, had been to two sleep doctors, and had two different sleep studies over roughly a ten-year period. (R. 58). The claimant stated that he tried to wear his sleep mask for about a month but was unable to sleep with it on.

A vocational expert, Ms. Strickland, testified concerning the type and availability of jobs the claimant was able to perform. (R. 55-57). The ALJ posed hypothetical number one, assuming a person of the same age, education, and work experience as the claimant, and who was limited to light work with the following limitations: occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional kneeling and crouching; frequent stooping and crawling; occasional

exposure to extreme cold or heat as well as humidity and pulmonary irritants, such as fumes, odors, dust, and gas; occasional exposure to hazards such as moving machinery or unprotected heights and uneven terrain. (R. 55-56). Ms. Strickland testified that the claimant's past work was not available; however, the hypothetical individual could perform other light, and unskilled work such as a cashier, storage facility rental clerk, and information clerk. (R. 56). Ms. Strickland testified to the following number of jobs per profession: approximately 2,000 cashier jobs in Alabama and 531,000 nationally; 9,000 storage facility rental clerk jobs in Alabama and 66,000 nationally; and 700 information clerks in Alabama and 60,000 nationally.

The ALJ then posed hypothetical number two in which the individual was limited to light work with the following limitations: standing and walking restricted to a combined five hours in the course of an eight hour day; occasional foot control operation bilaterally; occasional climbing of ramps and stairs, ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; occasional overhead reaching; and frequent reaching bilaterally in front and from the waist to shoulder level. The environmental limitations, as well as the hazards, remained in place. Ms. Strickland testified that such limitations would reduce the cashier jobs by "approximately half," but would not affect the availability for the storage facility and rental facility clerk jobs. (R. 56-57).

Ms. Strickland testified that an individual should miss no more than two workings days per month on a regular basis. (R. 57). The ALJ asked Ms. Strickland whether an employee's absence, up to four days of work a month, would eliminate the jobs that she cited. Ms. Strickland testified that "[o]ver time it would." (R. 57).

In response to a question posed by the claimant's attorney, Ms. Strickland testified that

no jobs would be available if the employee was limited to sedentary work, but had to keep his feet propped up above or at waist level for 75% of the day. (R. 57).

*The ALJ's Decision*

On October 14, 2016, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R.40). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2018, and that the claimant had not engaged in substantial gainful activity since March 3, 2014, the alleged onset date. (R. 29).

Next, the ALJ found the claimant had the following severe impairments: hypertension; congestive heart failure; lumbar degenerative disc disease with radiculopathy; left knee degenerative joint disease; diabetes mellitus; peripheral edema secondary to peripheral vascular insufficiency; sleep apnea; and obesity. (R. 29).

Next, the ALJ found that the claimant did not have any impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.R.F. Part 404, Subpart P, Appendix 1. (R. 30). The ALJ considered listings 1.00, 1.02, and 1.04, which addressed the claimant's lumbar degenerative disc disease, left knee degenerative joint disease, and peripheral edema secondary to peripheral vascular insufficiency. The ALJ also considered listing 3.03, which addressed the claimant's sleep apnea; listings 1.00, 4.00, 4.02, and 4.04, which addressed the claimant's hypertension and congestive heart failure; and listing 9.00, which addressed the claimant's diabetes mellitus. However, the ALJ found that the claimant failed to meet the requirements for any of these listings.

Next, the ALJ determined that the claimant had the residual functional capacity to perform light work, with the limitation that the claimant could only stand and/or walk in

combination for five hours in an eight-hour day. (R. 31). The ALJ also determined that the claimant could occasionally operate foot controls bilaterally; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead; frequently reach bilaterally, in front, and from waist to shoulder level; occasionally be exposed to extreme cold or heat, as well as humidity and pulmonary irritants such as fumes, odors, dusts, and gases; and occasionally be exposed to hazards such as moving machinery, unprotected heights, and uneven terrain.

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 32). Specifically, the ALJ determined that the evidence of the record showed these impairments were well-controlled with prescription and over-the-counter medications; the claimant's physical examinations were basically normal; and the claimant's ability to complete activities of daily living and remain socially active. (R. 33-37).

The ALJ also referenced to Dr. Ayres' February 17, 2015 letter, and the March 8, 2016 assessment throughout his opinion. The ALJ opined that the letter written by Dr. Ayres in February 2015 indicated that the claimant's symptoms could be controlled with compliance and adjustments to his medication. (R. 33-35). The ALJ also determined that Dr. Ayres' assessment of the claimant in March 2016 indicated that the claimant maintained the ability to work. (R. 34-37).

The ALJ determined that the record did not support the disabling symptoms and limitations alleged by the claimant regarding his peripheral edema secondary to vascular insufficiency, left knee degenerative joint disease, and lumbar degenerative disc disease. (R. 32). In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. Specifically, regarding the claimant's peripheral edema, ALJ noted the claimant's statement to Dr. Morin on February 3, 2015, in which the claimant voiced that his lower extremity swelling was under control with the use of diuretics as an outpatient. The ALJ also noted that at this visit, the claimant had normal strength and motion in all four extremities, and no focal deficits with normal gait. (R. 33).

Regarding the claimant's degenerative arthritis of his left knee, the ALJ considered the claimant's statements made at Southeastern Pain Management in 2012 and 2013, in which he stated that rest and medication helped relieve his symptoms, and his pain was a three out of ten. The ALJ also recounted NP Doyal's statements during that time, such as the claimant moved from the chair to exam the table with ease; he had a normal gait; that the examination of his knees showed no effusion; and that the claimant had no gross instability of his knees. (R. 32). Regarding the claimant's lumbar disc degenerative disease, the ALJ noted that the claimant's MRI of his lumbar spine was normal. (R. 33).

The ALJ also found that the claimant's hypertension and congestive heart failure were not as severe as he alleged. (R. 34). In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. Specifically, the ALJ noted that, after the claimant's congestive heart failure diagnosis in 2014, his symptoms improved, and the claimant's doctors reported that he was doing well on his current medications. (R. 35). The ALJ determined that the claimant's hypertension and congestive heart failure had been well-

controlled with prescription medications, and that the evidence failed to demonstrate end-organ damage. (R. 36).

The ALJ also determined that the claimant's sleep apnea and diabetes mellitus were not as severe as the claimant alleged. (R. 36-37). The ALJ considered the claimant's symptoms and the corresponding medical record in making this finding. Specifically, the ALJ noted the claimant's noncompliance with his CPAP and BiPAP; that the claimant had minimal treatment regarding his diabetes; and that the claimant's symptoms were not continuous.

Finally, the ALJ evaluated the claimant's obesity and accompanying impairments in accordance with SSR 02–1p. (R. 37). The ALJ determined that the claimant's obesity did not significantly interfere with his ability to perform physical activities or routine movement consistent with the exertional requirements of his designated residual functional capacity. The ALJ considered the claimant's symptoms and corresponding medical record. Specifically, the ALJ found that the claimant's obesity likely contributed to his symptoms, but that no substantial evidence supported that the claimant's obesity precluded him from work at the light level of exertion. Additionally, the ALJ noted that the claimant alleged no limitation because of his obesity.

The ALJ noted the claimant's statements about his symptoms at the hearing: that he cannot work because of pain and swelling in his feet; that standing and driving made his feet swell; and that, since being out of work, his back had not bothered him. (R. 31-32). The ALJ also noted that the claimant was in pain management, but that he was only taking over-the-counter medications for his symptoms. Additionally, the ALJ noted that the claimant stated he was able to do housework, drive, go to his daughter's school functions, and attend church. (R. 34, 36).

Regarding the opinion evidence, the ALJ assigned some weight to the opinion expressed

by non-examining state agency physician, Scott Touger, M.D. (R. 38, 69-81). The ALJ noted that, out of an abundance of caution in light of the evidence of the record and hearing testimony, the claimant was more limited than determined by Dr. Touger. The ALJ afforded some weight to Dr. Touger's opinion to the extent that it was consistent with the claimant's residual functional capacity.

The ALJ assigned little weight to the opinion of treating physician, Dr. Ayres. The ALJ noted that Dr. Ayres' forms and records were completed in relation to the claimant's work-related disability insurance and did not offer a functional capacity. (R. 38). The ALJ determined that Dr. Ayres' opinion in the forms and records was undermined by his March 8, 2016 assessment of the claimant. The ALJ opined that Dr. Ayres' assessment indicated that the claimant was "capable of at least a range of light work." The ALJ gave Dr. Ayres' assessment partial weight, given that the assessment was consistent with the claimant's physical findings throughout, and the comprehensive medical evidence review done by Dr. Touger.

The ALJ also considered the third-party report made by the claimant's mother, Elaine Knight. (R. 38). The ALJ noted that Ms. Knight reported that the claimant engaged in yardwork, normal activities, and performed a broad range of activities of daily living. The ALJ opined that the report was useful in determining the full scope of the claimant's impairments and was, therefore, assigned some weight.

The ALJ assigned little weight to the opinion of NP Karina Crosen. (R. 38). The ALJ noted her opinion was remote to 2012 and related to an earlier medical procedure the claimant underwent. The ALJ gave deference to Dr. Touger because he is an acceptable medical source, and he had the opportunity to review the claimant's longitudinal treatment history.

Finally, based on the record as a whole, the ALJ determined that the claimant was unable

to perform any past relevant work as a quality assurance inspector. (R. 38-39). The ALJ determined that, considering the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, jobs existed in significant number in the national economy which the claimant could perform, including cashier, storage facility rental clerk, and information clerk. (R. 39). Thus, the ALJ concluded that the claimant was not disabled as defined in the Social Security Act. (R. 40).

## VI. DISCUSSION

*Issue 1: The ALJ's Failure to Accord Proper Weight to the Treating Physician*

The claimant argues that the ALJ failed to accord substantial weight to his treating physician, Dr. Ayres, and did not have good cause for doing so. This court agrees.

The Eleventh Circuit has consistently held that the ALJ must give the opinion of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *See Lewis*, 125 F.3d at 1440. Good cause is found when the treating physician's opinion was not bolstered by the evidence, was contrary to the evidence, inconsistent with the doctor's own medical records, or conclusory. *Id*.

In the present case, substantial evidence does not support the ALJ's reasoning for assigning little weight to the opinion of the claimant's treating physician Dr. Ayres. The ALJ assigned little weight to Dr. Ayres' opinion because the forms and records containing his opinion were "completed in relation to the claimant's work-related disability insurance and do not offer a functional capacity." The ALJ also determined that Dr. Ayres' assessment of the claimant undermined his opinion in the previous medical records. The record does not support the ALJ's contentions.

The record does not indicate that Dr. Ayres only developed his opinion of the claimant's medical impairments for the purpose of work-related disability. Furthermore, this court could find no precedent to support that an ALJ can disregard a treating physician's opinion simply because the claimant sought it for a work-related disability. Giving or forming an opinion on the claimant's medical condition for this purpose does not necessitate a finding that the opinion was contrary or against the weight of the evidence, inconsistent with Dr. Ayres' records, or conclusory.

Contrary to the ALJ's contention, Dr. Ayres' records *did* offer statements regarding the claimant's functional capacity. Specifically, in January 2015, Dr. Ayres noted that the claimant's leg swelling worsened if he was standing for any period of time. Dr. Ayres also noted during this visit that the claimant "basically wears slippers all of the time," and the claimant's swelling prevented him from wearing the proper shoes for work. In a letter written in February 2015, Dr. Ayres' determined that the claimant could "basically" carry out activities of daily living; however, "that is about all he is able to do." Dr. Ayres noted the claimant's statement that any significant amount of movement caused his legs to swell and caused him a great deal of pain. Dr. Ayres also noted that the functional deficits were self-reports from the claimant; however, physical examination showed a significant amount of swelling and chronic venous stasis. Finally, in October 2015, in addition to the limitations previously mentioned, Dr. Ayres listed that the claimant could stand minimally and could not walk greater than 50 feet. (R. 420, 422, 440-47).

Moreover, even if Dr. Ayres' had not offered any opinion on the claimant's functional capacity, silence on the matter is not good cause to afford the opinion little weight because a treating physician is not required to offer a functional capacity. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (noting that a physician's silence on a claimant's functional capacity

does not translate into an opinion that a claimant can work); *see also Baez v. Comm'r of Soc. Sec.*, 657 F. App'x 864 (11th Cir. 2016) (finding that, although medical reports should include statements discussing what a claimant can do despite his impairments, lack of establishing physical impairments does not make the reports incomplete).

Finally, the ALJ also determined that Dr. Ayres' assessment undermined his opinions in his previous medical records. The ALJ opined that the assessment of the claimant's functional capacity provided by Dr. Ayres on March 8, 2016 indicated that the claimant was capable of "at least a range of light work." However, the ALJ failed to clearly articulate *how* Dr. Ayres' assessment undermined his opinions. The assessment restricted the claimant from standing for prolonged periods of time, climbing, exerting himself, and lifting, especially above his head. The court can find nothing in the record from Dr. Ayres that undermines the restrictions he placed on the claimant.

The ALJ's reasons for affording little weight to Dr. Ayres' opinion lack good cause; therefore, this court finds that the ALJ erred in failing to accord the claimant's treating physician Dr. Ayres' opinion substantial weight.

## VII: CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

**DONE** and **ORDERED** this 6th day of September, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE